Robert M. Seines, #16046
P.O. Box 313
Liberty Lake, WA 99206
509-844-3723
rseines@msn.net

*Attorney for Jose Garcia-Villa*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) NO. 2:20-CR-00066-TOR |
| vs. | ) SENTENCING MEMORANDUM |
| JOSE GARCIA-VILLA, | ) |
| Defendant. | ) |

JOSE GARCIA VILLA, through counsel, Robert M. Seines, submits the following Sentencing Memorandum:

**1. Procedural Overview.** On October 6, 2020 Jose Garcia-Villa entered a guilty plea to Possession with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing Methamphetamine, in violation of 21 U.S.C. §841 (ECF 21 and 22).

DEFENDANT'S SENTENCING
MEMORANDUM - 1

Under the Plea Agreement the United States agreed that he should receive the maximum downward adjustments under the sentencing guidelines for acceptance of responsibility, and that Mr. Garcia-Villa may be eligible for a two-level safety valve reduction because of his criminal history score of 1, and other relevant factors in USSG 2D 1.1(b)(18). Having qualified for safety valve, the Court may also disregard the statutory mandatory minimum sentence pursuant to 18 U.S.C. §3533(f)(1)-(5).

However, notwithstanding the downward adjustments, Mr. Garcia-Villa's guideline offense level is 33 because of the quantity of drugs at issue, and he is exposed to a final guideline range of 135 to 168 months. See; Presentence Investigation Report, ECF 29 at ¶ 159.

Mr. Garcia-Villa is scheduled to be sentenced on January 5, 2021 (ECF 22). He requests to Court to review his background, the facts of this case, and the authorities set forth below and impose a significantly lower sentence in accord with 18 U.S.C. § 3553(a)(2).

**2.     Facts.**     The PSIR (ECF 29) outlines the facts of this case beginning at Part A, ¶ 9. Mr. Garcia-Villa was arrested on January 27, 2020 at a residence in Spokane. He lived near Yakima and had borrowed a vehicle from a

friend earlier that day. His own vehicle was broken down and he could not afford to repair it. He also needed to have another friend drive the car because Mr. Garcia-Villa's license was suspended. During their investigation, officers learned that Mr. Garcia-Villa and his friend drove from Yakima to Federal Way, then to Spokane. An individual in Federal Way took possession of the car and drove off and returned about a half hour later. This individual hid packages of Meth and Heroin inside the vehicle's trunk.

On January 30, 2020 law enforcement executed a search warrant on the vehicle and recovered 5.2 kilograms of Meth and 1.89 kilograms of Heroin from the vehicle.

**3.      Sentencing Guidelines.**  Probation has correctly calculated the total offense level under the sentencing guidelines at Level 33 after taking into account the weight of the substance per USSG §2D1.1, and the adjustments discussed above. ECF 29 ¶¶ 37 to 46.

The weight of the controlled substances seized is the *single* factor with the most impact on Mr. Garcia's offense level of 33. It is because of the weight of the actual Meth and Heroin. The converted weight of the Meth places the drugs in the over 90 kilogram range of the Drug Quantity Table, USSG 2D1.1(c)(1).

This produces a base offense level of 38, which is reduced to 33 by the safety valve and accepting responsibility adjustments, and when combined with a Criminal History Category of 1, results in the Guideline range of 135 to 168 months of imprisonment.[1]

In contrast, if the weight of the Meth was less than 500 mg, which is at the opposite end of the Drug Quantity Table, the offense level would be 12, which results in a guideline range of 10 to 16 months – less than 1/10th the time of imprisonment compared with an offense level of 33.

The relationship between quantity and the increase in base offense level set forth in this part of the Guidelines has been questioned by courts and legal scholars.

The usefulness of the Guidelines' Loss Table that is used in fraud cases was aggressively challenged by Judge Rakoff in *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006). Judge Rakoff stated:

> As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is

---

[1] See PSIR, ECF 29 at ¶159.

DEFENDANT'S SENTENCING
MEMORANDUM - 4

> appropriate to accord such huge weight to such factors. *See generally,* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).

441 F.Supp.2d at 509.

> …
>
> While one might theorize as to why the Sentencing Commission promulgated each of these additions, "the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *Stith & Cabranes*, *supra,* at 69. Here, their combined effect-an added 20 points under the Government's approach-ill-fits the situation of someone like Adelson. It represents, instead, the kind of "piling-on" of points for which the guidelines have frequently been criticized *(cite to record omitted)*.

Id at 510-11.
> …
> What this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.

Id at 511.

We concede that the weight of illegal drugs is a logical factor in measuring the potential harm to the community, however Judge Rakoff correctly emphasizes that the bare guidelines are not derived from a transparent calculation of all of the variables that should be considered and weighed to come

up with an accurate assessment of the offense characteristics in a particular case.

However, this Court is well familiar that the calculation of a sentence under the Sentencing Guidelines is just the starting point to determine an appropriate and just sentence. We suggest there is history and other factors surrounding Mr. Garcia-Villa and this offense that justifies a sentence far below the guideline range.

**4. The Court can find reasons justifying a sentence outside the guideline range by considering the factors enumerated in 18 U.S.C. § 3553(a).**

The sentencing guidelines are just the "starting point in the initial benchmark" in determining a sentence. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596 (2007). "The guidelines are not the only consideration, and the district judge should consider all of the 3553(a) factors to fashion the appropriate sentence." *Id*.

The sentencing court is not required to see "extraordinary circumstances" in order to impose a sentence outside the guidelines. *Id* at 495-96. The district court judge has had the opportunity to become familiar with the case and the defendant, and, as compared with the Sentencing Commission, is "therefore, in a superior position to find the facts and judge there import under Section 3553(a)

DEFENDANT'S SENTENCING
MEMORANDUM - 6

in each particular case." *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558, 570 (2007).

18 U.S.C. § 3553(a) provides factors to be considered in imposing a just sentence that is "sufficient, but not greater than necessary" to reflect the seriousness and deter others from committing the crime, protect the public from future crimes by the defendant, and to promote respect for the law. Following is a discussion of these factors:

**a. The nature and circumstances of the offense and the history and characteristics of the defendant**.

The Presentence Report (PSI) references factors that the Court should consider. Notably, the PSI relates that when he was 3 years old, his mother took Mr. Garcia-Villa to Mexico to live with his grandmother to enable her to work in the fields back in the USA. While there he was subjected to poverty, hard physical labor and even physical abuse when he was unable to lift heavy bags of fruit. (PSIR at ¶¶ 95-97). He also reports that he was sexually assaulted by a family member while he was there. (PSIR at ¶108).

His mother brought him back to Yakima when he was 9, and life was much better. He attended school on a regular basis and helped his mother in the orchards. However, his mother was living with a man who physically abused her

DEFENDANT'S SENTENCING MEMORANDUM - 7

and inflicted trauma on Mr. Garcia-Villa. He got into a physical fight with the man when he was about 15 and his mother ended her relationship with the man after that. (PSIR at ¶¶ 97-98).

His sister, Angelica Villa, was interviewed by Probation and provided an insightful look into Mr. Garcia-Villa's history and present character. Ms. Villa states that he struggled to adjust when he returned to the USA. He went to school and played sports, but he had difficulty in school and, "got into things he shouldn't do." (PSIR at ¶104).

He began drinking alcohol and later on started using cocaine, and in recent years, Meth. (PSIR at ¶107).

Generally, the Guidelines foreclose any downward departure for lack of youthful guidance. U.S.S.G. § 5H1.12 ("Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range."). However, the Ninth Circuit and other circuit courts have held that a downward departure may be appropriate based on extreme childhood abuse. See, *United States v. Roe,* 976 F.2d 1216, 1218 (9th Cir.1992); *United States v. Pullen*, 89 F.3d 368, 372 (7th Cir.1996); *United States v. Clark*, 8 F.3d 839, 845–46 (D.C.Cir.1993); *United*

DEFENDANT'S SENTENCING
MEMORANDUM - 8

*States v. Vela,* 927 F.2d 197, 199 (5th Cir. 1991); *United States v. Deigert*, 916 F.2d 916, 919 (4th Cir.1990); and *United States v. Rivera*, 192 F.3d 81, 84–85 (2d Cir. 1999). This Court should consider a downward departure or variance based on Mr. Garcia Villa's abuse suffered as a child.

**b. The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense - to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

In Part F of the PSIR, Probation addresses §3553(a) and observes -- while Mr. Garcia has a past criminal history that began at age 18 - he has only accumulated one criminal history point. (PSIR at ¶ 156). Probation also notes that, "Mr. Garcia-Villa has a long-standing addiction to alcohol and controlled substances for which he has had little exposure to treatment." (PSIR at ¶158).

Mr. Garcia-Villa's medical history reveals other serious mental health issues that could have made him susceptible to being pushed or coerced into committing the instant offense. Medical records from Spokane Jail include a Washington Department of Corrections offender psychological profile that indicates that he had a listed intelligence quotient (IQ) of 71, and a "strong potential for being victimized." DOC recommended that he be segregated from predatory inmates and that he receive additional testing to determine if "some

level of mental retardation or developmental disability may be present." (See PSIR at ¶ 115).

The DOC assessment is congruent with Angelica's observations and assessment of her brother. She states that Mr. Garcia-Villa is a good person and a hard worker, but he has associated with "negative influences" and others have taken advantage of his kindness. And, his conduct in this case exposed their family to danger [by others involved in this criminal conduct]. (PSIR at 105 and ¶109).

However, Mr. Garcia-Villa has been close to his six children and has maintained contact with them up to the present time.

And perhaps -- Mr. Garcia's response to the question in the June 28, 2020 NaphCare Mental Health Screening; "How does the inmate feel about his current situation?" sums up his entire criminal history and predicts his law abiding future. The answer: "*I did a bad thing, I feel bad and have to pay consequences*."

**c.    the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The Presentence Investigation Report is replete with observations that Mr. Garcia-Villa likes to work and is a hard worker. He continues to work now as a

janitor in the Kittitas Jail and in the kitchen at the Spokane County Jail. He hopes to obtain vocational training to become an electrician, carpenter, and/or welder while in BOP custody.

Mr. Garcia would also benefit enormously from the supervision and resources available to BOP for substance abuse evaluation and treatment and also the evaluations suggested by Washington DOC to assess and provide coordinated medical and psychological treatment.

To this end, we request the Court exercise its discretion under 21 USC § 862 and maintain Mr. Garcia-Villa's eligibility for federal benefits, including SSI and Medicaid after he is released from BOP custody.

## RECOMMENDATION

Based on the facts in the record and the above memorandum, Jose Garcia-Villa asks the Court to follow the joint recommendation of the United States and Mr. Garcia-Villa.

RESPECTFULLY SUBMITTED this 29th day of December, 2020

*s/ Robert M. Seines, #16046*
Attorney for Jose Garcia-Villa

# CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send a copy of such filing to the following: Caitlin Baunsgard, Assistant United States Attorney.

*s/ Robert M. Seines, #16046*
ROBERT M. SEINES